# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

Richard W. Downing, Appellant,

v.

Rebecca B. Downing, Respondent.

Appellate Case No. 2019-001980

———————

Appeal From Charleston County
Vicki J. Snelgrove, Family Court Judge

———————

Opinion No. 6002
Heard September 15, 2022 – Filed July 26, 2023

———————

**AFFIRMED**

———————

William P. Tinkler and Paul E. Tinkler, both of Tinkler
Law Firm, LLC, of Charleston, for Appellant.

Mark O. Andrews and Kelley D. Andrews-Edwards, both
of Andrews Mediation and Law Firm, PA, of Mount
Pleasant, for Respondent.

———————

**VINSON, J.:** Richard W. Downing (Husband) appeals the family court's order
denying his request for a reduction in his alimony obligation and awarding
attorney's fees to Rebecca B. Downing (Wife). On appeal, Husband argues the
family court (1) failed to analyze the factors enumerated in section 20-3-170(B) of

the South Carolina Code (2014),[1] (2) improperly characterized his deferred compensation benefit as income, (3) erred in finding there had not been a material change in circumstances, and (4) erred in awarding Wife $42,000 in attorney's fees. We affirm.

## FACTS AND PROCEDURAL HISTORY

Husband and Wife (collectively, the parties) were married in 1982 and separated in January 2010.  In March 2010, Wife filed a summons and complaint.  The family court approved a final settlement agreement (the Agreement) in 2011,[2] which provided Husband would pay Wife $3,500 per month in permanent periodic alimony and $60,000 in lump sum alimony.  Husband was further obligated to equally share his pension income with Wife.  Husband's 2010 financial declaration reflected $13,050 in gross monthly income; $6,898 in monthly expenses; $311,000 in assets; and over $485,000 in debt.  The circumstances upon which the Agreement was based are set forth below.

In May 2018, Husband filed an action for divorce and a reduction in alimony.  Husband alleged a material change in circumstances owing to his retirement in March 2018 and resulting reduction in his monthly income from $13,000 to $4,000.  Husband's June 2018 financial declaration reflected $4,000 in gross monthly income; $4,495 in monthly expenses; more than $800,000 in assets; and $130,000 in debt.  After a hearing, the family court issued a temporary order finding Husband failed to make a *prima facia* case warranting a temporary modification in his alimony obligation and ordered Husband contribute $5,000 to Wife's temporary attorney's fees.

Wife filed a motion to compel discovery in September 2018 seeking certain financial documentation from Husband, some dating as far back as seven years.  At the motion hearing, Wife alleged Husband had not been forthright regarding his "financial landscape" and failed to provide Wife with documentation in response to her requests to produce and interrogatories.  Among the information Wife sought were financial records pertaining to Husband's monthly expenses and his Regions Bank account, which Wife discovered after issuing subpoenas to financial

---

[1] Section 20-3-170(B) enumerates the factors the family court must consider when evaluating whether there has been a material change of circumstances for the purpose of modifying alimony upon the supporting spouse's retirement.
[2] The copy of the Agreement included in the record on appeal is missing the next-to-last page.

institutions to determine where Husband held accounts. The family court found several requests for production of documents were outstanding but limited the disclosure of some financial information, including credit card statements, to the three-year period immediately preceding Husband's action.

The family court held a final hearing on June 17 and 18, 2019. Husband testified that during the marriage, Wife was a traditional homemaker, earning income only from modeling early in their marriage and later, teaching piano lessons. He recalled Wife was diagnosed with multiple sclerosis in 2003 or 2004—before their separation—and confirmed he had witnessed a progression in her symptoms. Husband entered his 2017 and 2018 federal and state tax returns into evidence without objection and identified his June 2019 financial declaration. He explained that at the time of the parties' separation in 2010, they were "essential[ly] bankrupt." Husband testified that under the Agreement, he agreed to assume certain debts, both to individuals and to various financial institutions. He confirmed the Agreement obligated him to pay Wife $3,500 in monthly alimony and half his monthly pension, which totaled an additional $500 a month.

Husband testified his position with his employer was eliminated in April 2017 but he secured another position within the company at that time; however, this position was eliminated in March 2018 and he retired. Husband was sixty-seven at the time of his retirement, and he received a severance package as a result of his termination. Based on a statement from the Social Security Administration, Husband confirmed his taxed Medicare earnings for 2010 totaled $216,000 and by 2016, his earnings had reached a high point of $279,598. He indicated his earnings dropped to $83,000 in 2018 as a result of his retirement. Husband testified he did not search for another job outside of his company when his position was eliminated in March 2018 but indicated he was prepared to work until about the time of the hearing. He believed his age, health, and eyesight problems would have prevented him from finding employment. Husband elaborated that he suffered "eye issues" for a number of years, which made tasks such as reading and driving in adverse conditions difficult. To support this testimony, Husband entered into evidence medical information dating from 2014 regarding his eyesight issues, including a retinal detachment in one eye.

Husband explained his financial strategy from 2010 forward was to pay down his debts and defer as much income into his retirement accounts as possible. Husband testified he lived with a roommate in Atlanta, Georgia, with whom he split rent and expenses, until two years before the hearing. At the time of the final hearing, he lived in a one-bedroom apartment. He stated he had cut his expenses by cancelling

his cable subscription and country club membership, and he indicated he intended to move out of Atlanta to reduce his expenses further. However, Husband acknowledged he had spent more money than usual in the year preceding the hearing due to his retirement. Husband testified he took "a series of small trips" in 2018 to Los Angeles, California to attend the Rose Bowl; Aruba; Iceland; Copenhagen, Denmark; and Spain. Husband maintained this reflected the majority of his travel in that year and his other travels included driving to destinations such as Florida, where he could stay with friends free of charge.

In reviewing his June 2019 financial declaration, Husband confirmed he included the following as monthly income: $645 in pension benefits; $2,700 in social security benefits; $77 from Prudential insurance; and $1,704 in interest.[3] He explained the interest figure reflected the total principal balance of his retirement accounts charged at an interest rate of 3.5%. Husband testified his retirement accounts were comprised of deferred stock units in his former employer that he categorized as deferred income, an IRA account,[4] and a Wells Fargo Executive Retirement Account. He determined the value of the deferred stock units by multiplying the number of units he held by the stock price of the day. The total pretax value of these retirement accounts was $676,219.

As to the deferred stock units, Husband explained that after receiving a distribution, the stock units went into an account from which he could then sell the stock after paying a commission. Husband testified he received annual distributions from his deferred stock and executive retirement account in February. He explained he would receive two more annual deferred stock distributions and eight additional annual distributions from his executive retirement account. Husband indicated he purchased a $10,000 United States Treasury Bill with proceeds from the sale of his deferred stock units and he intended to use the return from that investment later in the year to pay his debts. He stated his financial

---

[3] A notation on Husband's June 2019 financial declaration stated the $1,704 interest figure represented "imputed income derived from 3.5% of net worth ($584,077)."

[4] Husband's June 2018 financial declaration does not list the Janney Montgomery Scott IRA account, which was valued at $160,324 on his June 2019 financial declaration. His June 2018 financial declaration lists two 401(k) accounts, with a total value of $152,755, that are not listed on his June 2019 financial declaration. In his March 2019 deposition, Husband testified he transferred one of these 401(k) accounts into the IRA account; however, his deposition testimony was unclear as to whether the second 401(k) account was also transferred into the IRA account.

strategy since 2011 was "first and foremost" to ensure he could meet all of his monthly obligations to Wife, and he then prioritized significantly reducing his debt obligations and ensuring he could meet his own financial needs. He believed that a reduction in his monthly alimony obligation to $2,050 a month was "fair and sustainable."

On cross-examination, Husband confirmed he received distributions valued at approximately $40,000 in both 2018 and 2019 from his executive retirement account. Husband could not recall the amount of the February 2019 distribution from his deferred stock units. He acknowledged he deposited $56,000 into one of his bank accounts in February 2018. Husband testified those funds were related to a stock distribution that he sold from his deferred stock account. He explained the $34,816 stock value listed under the company name "Wells Fargo Share Owner's Stock" in the nonretirement securities section on his June 2018 financial declaration reflected the value of the distributed stock he had not sold at the time he completed his financial declaration. When asked where he indicated on his financial declarations that he had received distributions from his deferred stock and executive retirement accounts, Husband responded it was reflected in the value of his retirement assets. He testified the income he received in regular salary before his retirement in March 2018 and $26,000 severance payment were reflected in his bank account balances on his June 2018 financial declaration.

Husband confirmed that both his June 2018 and June 2019 financial declarations reflected monthly expenses totaling approximately $4,500 and he intended that to be a truthful representation. Husband later testified this amount reflected what he anticipated spending in the future and his expenses since his retirement were not typical. Wife then questioned Husband about his direct testimony related to his travel the previous year. She specifically questioned Husband about charges made to three of his credit card accounts that appeared in his monthly statements from March 2018 to April 2019. Husband confirmed charges related to the trips he testified to during his direct testimony as well as charges related to additional trips within the United States to attend social and sporting events and other international travel. The charges reflected substantial amounts spent on airfare and dining. In addition to air travel, Husband testified he drove long distances on several occasions, including to the Florida Keys and New York, in an attempt to reduce his travel expenses. He testified he also planned to travel to Ireland in July 2019 to attend the Open Championship. Husband maintained his monthly expenditures would match those reflected in his financial declarations after this trip.

Husband acknowledged he had less than $100,000 in assets at the time the parties entered into the Agreement in 2011 and the total value of his assets had increased by almost $850,000 since that time. He also acknowledged he had paid down a significant portion of his debt, almost $400,000. Husband agreed this showed a $1.2 million increase to his net worth.

Husband confirmed his 2018 federal tax return showed he had $279,491 in gross income that year, which he agreed that divided monthly throughout the year, totaled $23,000 per month. When asked why he indicated on his financial declaration his monthly income was only $4,400, Husband responded, "So those have already been distributed, so I didn't count them as monthly income." He explained the distributions had been captured as assets on his financial declaration. Husband confirmed that based on his 2018 and 2019 financial declarations, his monthly expenses were $2,400 less than his stated monthly expenses in 2011. Husband confirmed he deposited $48,442 into his bank accounts in January 2019 and an additional $81,977 in February 2019. He testified he put some of those funds into high-interest savings accounts and purchased a United States Treasury Bill for $9,875. Husband admitted to withdrawing funds from the savings accounts to fund his debts. He further admitted to using around $60,000 of the approximate $100,000 he deposited into his bank accounts in January and February 2019 to pay debts. Later, Husband could not recall what he did with significant amounts of cash totaling over $15,000 he received from checks issued by his employer as part of a stock distribution.

Wife then questioned Husband about check deposits made into his Regions Bank account from a company named "Potter Concrete" in Texas. Husband did not disagree with Wife's assertion that the funds deposited since 2011 totaled almost $450,000. Husband stated the funds were connected with his facilitation of the sale of badges to the Masters Tournament to friends. On redirect, Husband testified his arrangement with Potter Concrete to procure badges for the Masters Tournament predated the Agreement by almost thirty years. He maintained he did not earn any income from these transactions. Husband explained he would cash part of the checks to pay the badge sellers and would retain some funds across multiple accounts for later payment; he also stated he did not like to carry large amounts of cash as explanation for why he only partially cashed these checks. Husband admitted to facilitating ticket sales to another sporting event but maintained he did not make a profit off of the transaction.

Husband confirmed he felt a strong obligation to support Wife. He stated he was unaware Wife would have a monthly deficiency of over $3,000 if his alimony

obligation was reduced to $2,050. Husband maintained he did not have any hidden sources of income. He stated the record of how much money he was able to save was evidence of his frugal lifestyle. Husband expressed his desire for Wife to move to Washington state to live with her brothers in an attempt to cut expenses and to have someone nearby to support her. He believed it would be less expensive for her to live in Washington than in Mount Pleasant, South Carolina. Husband acknowledged Wife did not have the financial means to pay his attorney's fees or her own attorney's fees.

Kelly Simon, a forensic accountant, testified she used Husband's 2018 federal tax return to create a mock financial declaration document. She explained she differentiated Husband's regular wages and deferred compensation income but that both were included as income. Simon also included Husband's pension and annuity income, as well as his social security income and dividend interest for a total gross monthly income of $23,666. Simon explained that she created a comparison of Husband's 2010 financial declaration and her mock financial declaration and it reflected an almost $10,000 increase in Husband's gross monthly income from 2010 to 2018. She explained the difference in Husband's net income for that time period showed an increase of almost $9,000. As to the check deposits from Potter Concrete, Simon testified the total amount deposited since 2011 was more than $457,000. She testified that over the fourteen-month period from February 1, 2018 to March 31, 2019, Husband deposited $374,885 into his bank accounts. Simon further testified Husband had credit card charges totaling $62,259 from January 2018 to March 2019, and he regularly paid his credit card balances in full. On cross-examination, Simon confirmed she did not review any of Husband's older credit card statements. She acknowledged she could not determine whether Husband provided cash payments to the individuals selling their Masters Tournament badges.

On the second day of trial, Wife published a letter from her physician regarding her multiple sclerosis diagnosis. The letter stated Wife suffered from primary progressive multiple sclerosis and her condition would continue to worsen over time. Her physician noted Wife suffered from muscle weakness and fatigue and she had to make many adjustments to accommodate her condition, including having her groceries delivered to her home and using a wagon to get the groceries inside her home, which still caused great difficulty. The letter also described Wife's difficulty in preparing meals and washing dishes and completing everyday tasks such as picking items up with both hands. Her physician expected Wife to be wheelchair-bound in the future and would require assistance with routine activities such as bathing, dressing, and meal preparation. The letter stated Wife had been

unable to work for many years due to her diagnosis and cautioned Wife to limit her piano teaching to avoid exhausting herself. Finally, Wife's physician stated Wife would require regular medical care and in the future, specialized medical equipment.

Wife testified she was fifty-nine years old. She stated she had lived at her current residence since 2012. Wife explained the house met her medical needs and the landlord had made further improvements to accommodate her changing needs. She stated her neighbors helped her with everyday tasks and checked in on her. Wife noted she had many friends that lived near her. She testified she made $325 per month teaching piano lessons. In describing her daily routine, Wife testified it took her two-and-a-half to three hours to get ready in the morning if leaving the house. She described herself as a "homebody" but noted she occasionally had friends and family visit her or she would go to dinner or drinks with friends. Wife explained she splurged approximately three times a year on dinner when her daughters visited but noted she did not pay for their meals. She testified she typically only traveled to visit her daughters once a year due to cost.

Wife testified that in two months' time, her medical insurance premium would increase significantly to over $1,000 per month. She stated her monthly rent totaled $1,600 and food and household supplies cost her approximately $400 per month. Wife noted she tried to eat inexpensively by purchasing basic food items such as beans and rice. She indicated her largest expenses were related to her medical needs, including a recent increase in her prescription drug prices. Wife testified she was unable to afford all of the medication prescribed to treat her multiple sclerosis. She confirmed she had a current deficiency of $500 a month that would increase to $1,600 a month when her insurance premium increased. Wife acknowledged she had significant personal debts owed to a friend as well as outstanding fees and costs of $41,938 owed to her attorneys. She stated she did not have the ability to pay these debts or the $4,500 in fees associated with Simon's financial services. She confirmed that pursuant to the fee agreement with her attorneys, one of her attorneys, Kelly Andrews-Edwards, reduced her hourly rate from $400 to $175 for representation in this matter. Wife testified a friend gifted her $3,000 annually to cover a prior increase in her rent. She indicated there was no assurance she would continue to receive these funds and her friend had recently informed her that her financial circumstances had changed. Wife confirmed she had a Roth IRA account valued at $17,000 but if Husband's alimony obligation was reduced to $2,050, her monthly deficiency would increase to $3,600 and those funds would be quickly depleted.

On cross-examination, Husband entered a financial analysis he had prepared for the temporary hearing into evidence. The analysis included imputed income at 4% of the value of his nonmarital assets and showed figures reflecting his net income when his alimony obligation was set at 50%, 40%, and 33% of his net income. During redirect, the family court told the parties it understood Husband's position that his assets would be depleted at the current level of alimony and Wife's position that Husband misrepresented his income in his financial declarations as it pertained to the distributions from his deferred compensation and executive retirement accounts.

In its August 2019 order denying Husband's request for a reduction in his alimony obligation, the family court stated it "considered Husband's recent retirement, examined the circumstances which existed at the time Husband's alimony obligation was established in 2011, examined Husband's current financial circumstances, and examined Wife's needs and Husband's present ability to meet those needs." The family court also stated it considered and gave appropriate weight to the factors enumerated in section 20-3-130(C) of the South Carolina Code (2014). It stated Husband was sixty-eight years old and in reasonably good health at the time of his retirement. The family court also stated Husband's employer "closed down" the division Husband worked in, which led to his retirement. The court then noted,

> Retirement by a supporting spouse is grounds to warrant a hearing to evaluate whether there has been a change of financial circumstances sufficient to modify an existing alimony obligation. To justify modification or termination of alimony, the moving party must establish that there has been a substantial or material change of financial circumstances. It is well established that even where a supporting spouse['s] salary or income has been reduced by retirement, the [family c]ourt must examine the totality of the supporting spouse's financial circumstances such as the availability of assets which could be utilized to pay support. The [family c]ourt must assess the overall ability of the supporting spouse to pay the [c]ourt ordered alimony.

In its analysis, the family court made specific factual findings pertaining to Husband's 2018 taxable income, deposits of funds into Husband's checking accounts, distributions from Husband's retirement assets, Husband's assets and

liabilities at the time alimony was established, Husband's financial needs at the time alimony was established and his current financial needs, Husband's actual spending at the time of filing the alimony reduction action, Wife's medical needs and ability to earn income, and Wife's current expenses and assets. Specifically, the family court found Husband's income in 2018 totaled $283,987, or $23,666 per month. It determined Husband "grossly understated" his income by approximately $19,000 per month in his sworn June 2018 financial declaration. The family court concluded Husband's income was substantially greater than his income when his alimony obligation was established by the Agreement. It further found Husband's bank account records showed deposits totaling over $450,000 related to his selling Masters Tournament badges. The family court concluded "a great deal of cash [was] unaccounted for in these transactions" and Husband's testimony that he merely facilitated the sale of badges was not credible. Without determining a specific monetary amount, the family court concluded "Husband had income from sources other than those disclosed by [him]."

The family court further found Husband's 2019 year-to-date income substantially exceeded the amount he represented on his sworn June 2019 financial declaration. It concluded Husband received $83,000 in net deferred compensation income, representing more than $100,000 in gross income. The family court stated Husband failed to disclose this income or future streams of compensation from his former employer on his financial declarations. It concluded Husband presented no credible evidence showing his retirement materially reduced his income, as compared to his income when alimony was established, or that his retirement impacted his ability to meet his $3,500 per month alimony obligation. The family court rejected Husband's assertion that the majority of the funds disbursed to him in 2018 and 2019 were retirement pay and not income. It found Husband was required to disclose all retirement income on the first page of his financial declarations, which he failed to do. The family court noted Husband would receive deferred compensation income "in substantial but yet to be determined amounts" through 2027. The family court found Husband's financial declarations did not show or explain that Husband had received, and would continue to receive, income from his deferred compensation plans. It stated, "Husband portrayed a very misleading financial picture to . . . Wife and to the [family c]ourt."

The family court compared Husband's financial situation in 2011 to his current financial situation, finding it had substantially improved. The family court found Husband's monthly expenses had decreased since 2011; however, it determined Husband had "grossly misrepresented his spending related to travel, incidentals, and entertainment on his sworn financial declarations." It noted, "Husband was

enjoying a lavish, if not extravagant, lifestyle." The family court determined the testimony and evidence presented at trial did not support Husband's sworn testimony that he had modified his lifestyle and was living frugally. It specifically noted Husband's extensive travel and dining expenditures. The court determined Husband's spending evidenced his ability to pay alimony at the established amount. The family court concluded clear and overwhelming evidence showed Husband's overall financial circumstances had improved and he failed to demonstrate an inability to continue to pay Wife $3,500 in monthly alimony. It further noted Wife's "clear and profound need for continued alimony from Husband" due to her worsening medical condition and inability to earn significant income—Wife had no earned income at the time alimony was established in 2011. The family court determined Wife had a "very modest lifestyle" and was $400 a month short of meeting her monthly expenses, which would increase by $1,000 per month beginning September 2019 as a result of an increase in her health insurance premium. It noted Wife had virtually no assets from which she could draw to meet any financial shortfall and concluded that "[w]ithout the alimony payment from Husband, Wife would find herself unable to pay for her essential expenses and she would be in a truly destitute situation."

The family court also awarded Wife $42,000 in attorney's fees and costs. It found Husband made "gross misrepresentations . . . of virtually every material aspect of his financial circumstances." Specifically, the family court found Husband failed to provide Wife with sufficient responses to her requests for documentation, which necessitated Wife filing a motion to compel discovery. It determined that through the efforts of Wife's counsel, "Wife established that Husband had grossly understated his income and his spending." The family court acknowledged that "[a]t first blush," Wife's attorney's fees seemed more than what would be expected; however, it found that "in light of the gross misrepresentations by Husband, of virtually every material aspect of his financial circumstances . . . the efforts put forth by Wife's [counsel] were both reasonable and necessary." The family court concluded that without the efforts of Wife's counsel in uncovering evidence of Husband's financial circumstances, it "would have had only . . . Husband's misleading financial information upon which to base its decision." The family court further found the hourly rates charged by Wife's counsel were reasonable in light of their experience and standing in the legal community and that the time spent working on the case was necessary. It determined "Husband ha[d] demonstrated little if any financial restraint as evidenced by his lavish spending during the pendency of this action and his planned trip to Ireland in July 2019. Husband ha[d] the financial ability to contribute to the attorney's fees incurred by

Wife." The family court ordered Husband to pay the outstanding balance of Wife's attorney's fees totaling $42,000.[5]

Husband filed a motion for a new trial, or in the alternative, to alter or amend and for stay of the final order pursuant to Rules 59 and 62(b) of the South Carolina Rules of Civil Procedure. Husband requested that the family court receive additional evidence, including Husband's 2011 and 2019 deposition transcripts. He argued his 2011 deposition showed the Masters Tournament badge scheme was discussed with Wife's counsel before the Agreement was finalized and therefore Wife was "collaterally estopped from claiming [he] made money from this source." Husband further argued the family court misapprehended facts relating to the calculation of his income. Finally, Husband argued Wife's attorney's fees were unreasonable and much of the work Wife's counsel billed for was unnecessary.

At the outset of the motion hearing, the family court stated it had read the depositions submitted by Husband. Wife argued the depositions were not properly before the court. During the hearing, the parties addressed Husband's arguments relating to his 2011 and 2019 depositions, how his deferred income should be treated, the representations Husband made on his financial declaration, and the family court's alleged failure to address the elements under section 20-3-170(B) in its final order. Husband also noted Wife would be eligible to receive social security income in two years' time, and the family court responded it could not predict future events and Husband would need to file a motion at that time to reevaluate his alimony obligation. The family court denied Husband's motions and lifted the stay on the final order. It stated it had considered all of Husband's written submissions in reaching its decision. This appeal followed.

**ISSUES ON APPEAL**

1. Did the family court err by failing to analyze Husband's request for a reduction of alimony under the factors enumerated in section 20-3-170(B)?

2. Did the family court improperly characterize Husband's required annual payouts from his deferred compensation benefit assets as income when these assets made up the bulk of his post retirement net worth and were insufficient to last his lifetime if he continued to make alimony payments at the existing level?

---

[5] Wife's attorney's fees totaled $75,444, which was reduced by $33,500 to account for Husband's $5,000 payment under the temporary order and a $28,500 payment made by Wife's friend.

3. Did the family court err in finding that there had not been a material change of circumstances when Husband was mandatorily retired at the age of sixty-seven, had developed problems with his vision, was no longer earning a salary, and his assets were insufficient to last his lifetime if he continued to make alimony payments at the existing level?

4. Did the family court err by awarding Wife $42,000 in attorney's fees?

## STANDARD OF REVIEW

"The family court is a court of equity." *Lewis v. Lewis*, 392 S.C. 381, 386, 709 S.E.2d 650, 652 (2011). "Appellate courts review family court matters de novo, with the exceptions of evidentiary and procedural rulings." *Stone v. Thompson*, 428 S.C. 79, 91, 833 S.E.2d 266, 272 (2019). "[O]ur review of a family court's order on whether to modify support awards is de novo." *Miles v. Miles*, 393 S.C. 111, 117, 711 S.E.2d 880, 883 (2011). "[T]his court may find facts in accordance with its own view of the preponderance of the evidence." *Weller v. Weller*, 434 S.C. 530, 537, 863 S.E.2d 835, 838 (Ct. App. 2021). Although this court reviews the family court's findings de novo, we are not required to ignore the fact that the family court, which saw and heard the witnesses, was in a better position to evaluate their credibility and assign comparative weight to their testimony. *Lewis*, 392 S.C. at 385, 709 S.E.2d at 652-53. "The appellant maintains the burden of convincing the appellate court that the family court's findings were made in error or were unsubstantiated by the evidence." *Weller*, 434 S.C. at 538, 863 S.E.2d at 838.

## LAW AND ANALYSIS

### I. Consideration of Factors Under Section 20-3-170(B)

Husband argues the family court "ignored" section 20-3-170(B) in its order denying alimony modification by failing to mention the statute or analyzing the enumerated factors. We disagree.

> Retirement by the supporting spouse is sufficient grounds to warrant a hearing, if so moved by a party, to evaluate whether there has been a change of circumstances for alimony. The court shall consider the following factors:

(1) whether retirement was contemplated when alimony was awarded;

(2) the age of the supporting spouse;

(3) the health of the supporting spouse;

(4) whether the retirement is mandatory or voluntary;

(5) whether retirement would result in a decrease in the supporting spouse's income; and

(6) any other factors the court sees fit.

§ 20-3-170(B).

We find the family court considered all the factors enumerated in section 20-3-170(B) in its order denying Husband's request for a reduction in his alimony obligation. Although the family court did not specifically cite to section 20-3-170(B) in its order, it addressed all of the factors in its analysis. The family court specifically acknowledged the circumstances that led to Husband's retirement and his age and health. The court examined Husband's income in great detail, noted Husband participated in a "systematic plan to defer a portion of his earnings" subsequent to 2011, and referenced Husband's testimony "that he deferred income in order to continue to pay his obligations, with the exception of alimony, into his retirement."[6] Accordingly, we find the family court considered the mandated factors under section 20-3-170(B) and affirm as to this issue.

## II. Deferred Compensation Distributions

Husband contends the only "new" income he earned after his retirement came from his pension and social security payments and "yields from funds and securities he managed to save (or defer) over the years he was employed." He asserts his "previously earned assets"—the deferred compensation accounts—were not monthly income for purposes of evaluating his alimony obligation, but rather, were "annual conversions of pre-tax savings to post-tax savings." Husband avers this deferred income vested before his retirement and was "tantamount to retirement

---

[6] Husband contests the veracity of this factual finding; however, this demonstrates the family court considered the first enumerated factor under section 20-3-170(B).

savings." He argues that if this court accepts Wife's reasoning, he would be unable to modify his alimony until 2027, when his scheduled payments from his deferred compensation end and when his assets would be nearly depleted. We disagree.

We hold the family court did not err in characterizing the distributions Husband received from his deferred stock units and executive retirement accounts as income.[7] At the final hearing, Husband testified his financial strategy from 2010 onward was to defer as much income into retirement accounts as possible. His retirement assets included deferred stock units in his former employer, an IRA account, and an executive retirement account, which held both stock and cash assets. Husband acknowledged he received substantial annual distributions from the deferred stock units and executive retirement account and admitted he did not include these distributions in the calculation of his gross monthly income on his financial statements. He did not challenge that the distributions from these accounts were included as income on his 2017 and 2018 federal tax returns. Of the more than $100,000 in distributions Husband deposited in January and February 2019, Husband admitted to spending almost $60,000 of that amount as of June 2019.

Husband's June 2018 and June 2019 financial declarations listed his deferred stock units and executive account as both nonmarital assets and voluntary retirement accounts. In the nonmarital property section, the accounts were noted as a source of income to Husband. The value of these two accounts decreased by over $137,000 from 2018 to 2019; however, these distributions were not captured as income, Husband merely decreased the value of the assets without explaining how the entire value of the distributions from these accounts were spent or reinvested. Furthermore, Husband testified the asset values for these accounts included on his financial declaration were based on the stock's pretax value on a given day. This valuation failed to reflect the known actual value of the stock assets distributed to Husband in 2018 and 2019. Moreover, although Husband included imputed income derived from 3.5% of his net worth on his June 2019 financial declaration in his calculation of gross monthly income, this figure was inadequate to capture the actual value of the funds Husband was receiving, and admittedly spending,

---

[7] We note Husband failed to cite to any South Carolina case law in support of his argument that these distributions represented previously earned assets and should not be considered monthly income for purposes of reviewing his alimony obligation. *See Weller*, 434 S.C. at 538, 863 S.E.2d at 838 ("The appellant maintains the burden of convincing the appellate court that the family court's findings were made in error or were unsubstantiated by the evidence.").

from his deferred compensation accounts.  In addition, Simon's testimony supported the family court's characterization of the distributions as income.  Simon testified Husband's 2018 gross monthly income was $23,666, which included Husband's deferred compensation distributions.  Based on the foregoing, we hold the family court did not err in characterizing Husband's required annual payouts from deferred compensation benefit assets as income.  *See Weller*, 434 S.C. at 537, 863 S.E.2d at 838 ("[T]his court may find facts in accordance with its own view of the preponderance of the evidence.").

Furthermore, in determining whether to make an award of alimony, the family court must consider the nonmarital properties of the parties.  S.C. Code Ann. § 20-3-130(C)(8) (2014).  Husband categorized his deferred compensation accounts as nonmarital property on his June 2018 and June 2019 financial declarations.  Accordingly, we find the family court's consideration of the listed value of these accounts and distributions under these accounts was proper.

As to Husband's argument the family court implicitly found the exhaustion of assets was a necessary statutory element for a reduction in alimony upon retirement, we find this argument is without merit.  Section 20-3-170(B) merely provides that retirement by the supporting spouse is sufficient grounds to warrant a hearing under section 20-3-170(A) and sets forth specific factors the family court must consider in determining whether there has been a change in circumstances.  As discussed in more detail below, here, the family court determined there had not been a material change in circumstances warranting a reduction in Husband's alimony obligation.  In reaching this conclusion, the court not only considered the mandatory factors set forth under section 20-3-170(B) but it also considered Husband's financial ability to pay his alimony obligation.  Husband argues the annual distributions he received and will continue to receive should not be considered as income in determining whether he is able to meet his alimony obligation.  However, testimony and evidence showed Husband spent significant amounts of money after his retirement on travel and dining expenses in excess of the monthly expense figure represented to the family court in his June 2019 financial declaration.  At the time of the final hearing, this evidence showed Husband was financially able to meet his alimony obligation.  Accordingly, we find the family court's findings do not support Husband's assertion that the family court concluded only an exhaustion of his assets would support a reduction in his alimony obligation.  Further, under section 20-3-170(A), Husband may petition the court at any time to reduce his alimony obligation if the circumstances of the parties or the financial ability of the supporting spouse changes.  Although the family court determined that at the time of the final hearing there had not been a

material change in circumstance that supported reducing Husband's alimony obligation, this does not foreclose Husband's ability to petition the court at a later date to consider whether his or Wife's financial situation has changed to warrant a future reduction in his obligation.  Accordingly, we reject this argument.

## III.  Material Change of Circumstance

Husband argues the family court erred in failing to determine an appropriate alimony obligation.  Specifically, Husband contends his assets would be depleted in twelve years if his alimony obligation remains unchanged.  We disagree.

"The change in circumstances must be substantial or material in order to justify a modification of the previous alimony obligation." *Thornton v. Thornton*, 328 S.C. 96, 111, 492 S.E.2d 86, 94 (1997).  "Further, the change in circumstances must be unanticipated." *Penny v. Green*, 357 S.C. 583, 589, 594 S.E.2d 171, 174 (Ct. App. 2004).  "The party seeking modification has the burden to show by a preponderance of the evidence that the unforeseen change has occurred." *Butler v. Butler*, 385 S.C. 328, 336, 684 S.E.2d 191, 195 (Ct. App. 2009) (quoting *Kelley v. Kelley*, 324 S.C. 481, 486, 477 S.E.2d 727, 729 (Ct. App. 1996)).  "In addition to the changed circumstances of the parties, the financial ability of the supporting spouse to pay is a specific factor to be considered." *Riggs v. Riggs*, 353 S.C. 230, 236, 578 S.E.2d 3, 6 (2003).

> Whenever any husband or wife, pursuant to a judgment of divorce from the bonds of matrimony, has been required to make his or her spouse any periodic payments of alimony and the circumstances of the parties or the financial ability of the spouse making the periodic payments shall have changed since the rendition of such judgment, either party may apply to the court which rendered the judgment for an order and judgment decreasing or increasing the amount of such alimony payments or terminating such payments and the court, after giving both parties an opportunity to be heard and to introduce evidence relevant to the issue, shall make such order and judgment as justice and equity shall require, with due regard to the changed circumstances and the financial ability of the supporting spouse, decreasing or increasing or confirming the amount of alimony provided

for in such original judgment or terminating such
payments.

S.C. Code Ann. § 20-3-170(A) (2014).

We hold the family court did not err in finding there had not been a material change of circumstances to support reducing Husband's alimony obligation. Husband's argument on appeal relies substantially on Husband's "back-of-the-envelope" calculations included in his June 2019 trial brief and a comparison of the average amount of alimony as a percentage of the supporting spouse's gross income and the spouses' combined gross income awarded by South Carolina appellate courts in the five years preceding June 2019. Husband's argument ignores the family court's statutory and credibility findings concerning Husband's financial situation at the time of the final hearing. First, as discussed above, the family court did not err in characterizing Husband's required annual payouts from deferred compensation benefit assets as income. As to Husband's back-of-the-envelope calculations, we find they fail to reflect the known actual value of the stock assets distributed to Husband in 2018 and 2019 and how much of the distributions Husband spent as opposed to reinvesting. Moreover, the calculations were based on the value of Husband's retirement holdings at a certain point in time and without supporting testimony or evidence, the calculations were merely speculative. *See Butler*, 385 S.C. at 336, 684 S.E.2d at 195 ("The party seeking modification has the burden to show by a preponderance of the evidence that the unforeseen change *has* occurred." (emphasis added) (quoting *Kelley*, 324 S.C. at 486, 477 S.E.2d at 729)).

Second, Husband's reliance on comparisons of alimony as a percentage of gross income in support of his argument is misguided. In evaluating the statutory factors, the family court found "Husband portrayed a very misleading financial picture to . . . Wife and to the [c]ourt," and we defer to this finding. *See Lewis*, 392 S.C. at 385, 709 S.E.2d at 652-53 (holding that although this court reviews the family court's findings de novo, we are not required to ignore the fact that the family court, which saw and heard the witnesses, was in a better position to evaluate their credibility and assign comparative weight to their testimony). At the final hearing, Husband testified his financial declaration reflected what he anticipated spending after his July 2019 trip to Ireland, not his actual spending in the year prior to the final hearing. The testimony and evidence presented by the parties at the final hearing show Husband made significant credit card charges related to travel and dining from March 2018 to April 2019, after Husband's retirement. This included international travel, extensive domestic travel, and social

expenditures demonstrating a non-frugal lifestyle. Simon testified Husband's credit card charges totaled $62,259 over the fourteen-month period from January 2018 to March 2019 and Husband regularly paid his credit card balances in full. We find this testimony and evidence demonstrated that contrary to Husband's assertions, his lifestyle had not been negatively impacted by his retirement; further, Husband failed to present any evidence regarding his expenditures prior to his retirement.

In addition, a comparison of Husband's 2010 financial declaration with his 2018 and 2019 financial declaration shows an improvement in Husband's financial situation. In 2010, Husband had debts totaling $275,500 and assets with a negative value of $304,000. On his June 2019 financial declaration, Husband listed debts totaling $119,000 and assets valued at over $703,000. As discussed above, Husband's actual income in 2018 was significantly higher than the amount reflected on his financial declaration. In addition, Simon testified that over the fourteen-month period from February 1, 2018, to March 31, 2019, Husband deposited $374,885 into his bank accounts. Furthermore, the family court found "Husband had income from sources other than those [he] disclosed" in connection with its consideration of deposits totaling over $450,000 into one of Husband's bank accounts from Potter Concrete from November 2011 to March 2019. Although Husband asserts his March 2011 deposition testimony demonstrates he had not previously received any income from these transactions, we conclude Husband's testimony at the final hearing was inadequate to show he was not receiving income from these transactions. Husband failed to provide any evidence to support his contention that the cash received from these deposits was paid in full to the Masters Tournament badge holders. This evidence failed to demonstrate that Husband was unable to meet his alimony obligation at the time of the final hearing. *See Riggs*, 353 S.C. at 236, 578 S.E.2d at 6 ("In addition to the changed circumstances of the parties, the financial ability of the supporting spouse to pay is a specific factor to be considered."). Based on the foregoing, we find Husband failed to show a material change in circumstances to justify a reduction in his alimony obligation. *See Thornton*, 328 S.C. at 111, 492 S.E.2d at 94 ("The change in circumstances must be substantial or material in order to justify a modification of the previous alimony obligation."). Accordingly, we hold the family court did not err in finding there had not been a material change of circumstances to support reducing Husband's alimony obligation.

## IV. Attorney's Fees

Husband argues Wife's attorney's fees were unreasonable and he should not be required to contribute to any of Wife's attorney's fees beyond the $5,000 paid under the temporary order. We disagree.

> In determining whether an attorney's fee should be awarded, the following factors should be considered:
>
>> (1) the party's ability to pay his/her own attorney's fee;
>>
>> (2) beneficial results obtained by the attorney;
>>
>> (3) the parties' respective financial conditions;
>>
>> (4) effect of the attorney's fee on each party's standard of living.

*E.D.M. v. T.A.M.*, 307 S.C. 471, 476-77, 415 S.E.2d 812, 816 (1992). In determining the amount of attorney's fees to award, the court should consider "(1) the nature, extent, and difficulty of the case; (2) the time necessarily devoted to the case; (3) professional standing of counsel; (4) contingency of compensation; (5) beneficial results obtained; [and] (6) customary legal fees for similar services." *Glasscock v. Glasscock*, 304 S.C. 158, 161, 403 S.E.2d 313, 315 (1991).

We hold the family court did not err in awarding Wife $42,000 in attorney's fees. The family court did not err in determining to award Wife attorney's fees because the factors under *E.D.M. v. T.A.M.* were met. First, the testimony and evidence presented at the final hearing showed Wife did not have the financial means to pay her own attorney's fees. Wife testified she had a current deficiency of $500 a month that would increase to $1,600 a month when her insurance premium increased within two months of the final hearing. Second, Wife's counsel successfully defended Husband's alimony reduction action and was able to maintain Wife's current alimony amount. Third, as addressed in more detail above, Husband's financial condition supported substantial travel and social expenditures despite his retirement. Conversely, Wife testified she owed comparatively significant personal debts and had a modest retirement asset valued at $17,000. Wife further testified to an extremely frugal lifestyle. Lastly, Wife's standard of living would decrease significantly if she was required to pay her attorney's fees. Wife's health condition would continue to worsen over time as a result of her primary progressive multiple sclerosis diagnosis. Her physician expected Wife to be wheelchair-bound in the future and require assistance with routine activities

such as bathing, dressing, and meal preparation. Wife was already unable to pay for all of her medications at the time of the final hearing and she anticipated an increase in her prescription drug costs in the future, in addition to a significant increase in her health insurance premium. In contrast, based on the evidence previously discussed, Husband's standard of living would be impacted far less if ordered to pay attorney's fees. For these reasons, we find the family court did not err in awarding Wife attorney's fees. *See Weller*, 434 S.C. at 537, 863 S.E.2d at 838 ("[T]his court may find facts in accordance with its own view of the preponderance of the evidence.").

As to the amount of attorney's fees awarded, we find the family court did not err in determining Wife was entitled to $42,000 in attorney's fees. *See Glasscock*, 304 S.C. at 161, 403 S.E.2d at 315 (holding in determining the amount of attorney's fees to award, the court should consider "(1) the nature, extent, and difficulty of the case; (2) the time necessarily devoted to the case; (3) professional standing of counsel; (4) contingency of compensation; (5) beneficial results obtained; [and] (6) customary legal fees for similar services."). Wife's attorney's fees were substantially related to services rendered in preparing a motion to compel discovery, issuing subpoenas to financial institutions in an attempt to discern Husband's financial position, and preparing for the two-day final hearing. We conclude the time spent in association with these services was justified in light of Husband's misrepresentations regarding his financial position as demonstrated by the discrepancies between the information he provided in his financial declarations and the testimony and evidence presented at the final hearing refuting his initial representations to both Wife and the family court. Both of Wife's attorneys are of good professional standing. As noted previously, Wife's counsel successfully defended Husband's alimony reduction action and were able to maintain Wife's current alimony amount. One of Wife's attorneys reduced her customary hourly fee from $250 to $175, and neither attorney billed for all of their time. We acknowledge that $75,444[8] in attorney's fees would typically be considered high in an alimony reduction action; however, in light of Husband's unwillingness to be forthcoming about his financial situation, the fee was reasonable under the circumstances. *See Bodkin v. Bodkin*, 388 S.C. 203, 223, 694 S.E.2d 230, 241 (Ct. App. 2010) ("[W]hen parties fail to cooperate and their behavior prolongs proceedings, this is a basis for holding them responsible for attorney's fees."). Accordingly, we find the family court did not err in determining Wife was entitled to $42,000 in attorney's fees. *See Weller*, 434 S.C. at 537, 863 S.E.2d at 838

---

[8] The award amount was reduced by Husband's $5,000 payment under the temporary order and a $28,500 payment made by Wife's friend.

("[T]his court may find facts in accordance with its own view of the preponderance of the evidence.").

**CONCLUSION**

Based on the foregoing, we affirm the family court's final order denying Husband's request for a reduction in his alimony obligation and awarding Wife $42,000 in attorney's fees.

**AFFIRMED.**

**KONDUROS and HEWITT, JJ., concur.**